IN THE SUPREME COURT OF PENNSYLVANIA
MIDDLE DISTRICT
**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, JJ.**

| | | |
|---|---|---|
| THOMAS E. BOLD, JR., | : | No. 36 MAP 2023 |
| | : | |
| Appellant | : | Appeal from the Order of the |
| | : | Commonwealth Court dated |
| | : | November 21, 2022 at No. 784 CD |
| v. | : | 2020 Reversing the Order of the |
| | : | Cumberland County Court of |
| | : | Common Pleas, Civil Division, dated |
| COMMONWEALTH OF PENNSYLVANIA, | : | July 10, 2020 at No. 2020-02043 |
| DEPARTMENT OF TRANSPORTATION, | : | Civil Term. |
| BUREAU OF DRIVER LICENSING, | : | |
| | : | ARGUED:  November 29, 2023 |
| Appellee | : | |

## OPINION

**JUSTICE WECHT**                                    **DECIDED:  August 20, 2024**

The Vehicle Code[1] provides that "[a]ny person who drives, operates or is in actual physical control of the movement of a vehicle" has consented to chemical testing of that person's breath or blood

> for the purpose of determining the alcoholic content of blood or the presence of a controlled substance if a police officer has reasonable grounds to believe the person *to have been driving, operating or in actual physical control of the movement of a vehicle* in violation of [75 Pa.C.S.] section 1543(b)(1.1) (relating to driving while operating privilege is suspended or revoked), 3802 (relating to driving under influence of alcohol or controlled substance) or 3808(a)(2) (relating to driving while operating a motor vehicle not equipped with ignition interlock).[2]

---

1        *See* Act of June 17, 1976, Pub. L. 162, No. 81, 75 Pa.C.S. §§ 101, *et seq*.

2        75 Pa.C.S. § 1547(a) (emphasis added).

When a person refuses such testing, the Pennsylvania Department of Transportation, Bureau of Driver Licensing,[3] "shall suspend the operating privilege" of that person. What concerns us today is the meaning of "to have been driving, operating or in actual physical control of the movement of a vehicle."

Lower Allen Township Police Officer Thomas Gelnett found Thomas E. Bold, Jr., unconscious behind the wheel of a car parked legally in a mall parking lot near a bar. It was January 25, 2020, a dark and cold evening. The car's engine was running and the headlights were on. When roused, Bold appeared to be very intoxicated. He admitted to drinking at the bar nearby, and he explained that he had intended to sleep in his car until he was fit to drive home safely and legally. Officer Gelnett eventually arrested Bold for driving under the influence ("DUI"), took him into custody, and drove him to a nearby medical facility, where Bold refused to consent to a blood test.[4] Later, in keeping with Section 1547, PennDOT notified Bold that it was suspending his license due to his refusal.[5]

The question that we must confront—one that has, in various guises, bedeviled Pennsylvania courts for decades—is whether the circumstances described above gave Officer Gelnett "reasonable grounds to believe" that Bold was "operating or in actual physical control of the movement" of his vehicle at the time of, or before, his interaction

---

[3]     Hereinafter "PennDOT." In the interest of brevity and clarity, we extend this conventional abbreviation to the case captions below that formally refer to the Bureau of Driver Licensing.

[4]     At first, Bold indicated that he would submit to testing. But upon arrival at the facility, he refused to grant permission, insisting instead that he hadn't been driving.

[5]     The duration of the suspension varies based upon several factors. Bold's license was suspended for eighteen months due to a prior conviction for DUI. *See* 75 Pa.C.S. § 1547(b)(1)(ii)(B)(I).

with the officer.[6]  For the reasons that follow, we hold that the conditions did not furnish such grounds, and we reverse the Commonwealth Court's contrary ruling.

Upon receiving notice of his suspension, Bold filed a *de novo* appeal in the Court of Common Pleas.[7]  At the evidentiary hearing that followed, Officer Gelnett admitted that there was no evidence that Bold had driven his car or otherwise moved his vehicle at all while intoxicated.[8]  He further conceded that his observations were consistent with Bold's insistence that he was asleep in the car precisely because he intended *not* to drive until he could do so safely.[9]

After Officer Gelnett testified, the court invited argument from Bold's attorney, who directed the court's attention to a handful of cases.[10]  After a break, the court ruled from the bench: "we are satisfied that . . . the officer had reasonable grounds to believe that [Bold] was operating a motor vehicle under the influence of alcohol."[11]  Thus, the court upheld the license suspension.  However, later the same day, the court reversed itself, issuing a written order sustaining Bold's appeal.  The court explained that it "cannot find that [Officer Gelnett] had reasonable grounds to believe that [Bold] was in control of the

---

[6]     The specific question that we agreed to review is:

> Did the Commonwealth Court err by ignoring the controlling decisions of this Court in holding that vehicle movement by the impaired operator is not required to trigger Section 3802 and Section 1547 of the Vehicle Code[?]

*Bold v. PennDOT*, 298 A.3d 37 (Pa. 2023) (*per curiam*).

[7]     *See* 75 Pa.C.S. §§ 1547(b)(3), 1550 ("Judicial review").

[8]     Notes of Testimony, 7/10/2020, at 15 ("N.T.").

[9]     *See id*.

[10]     *Id*. at 16-18 (citing *Banner v. PennDOT*, 737 A.2d 1203 (Pa. 1999); *Solomon v. PennDOT*, 966 A.2d 640 (Pa. Cmwlth. 2009); *Commonwealth v. Paige*, 628 A.2d 917 (Pa. Cmwlth. 1993)).

[11]     *Id*. at 18.

movement of the vehicle at any time before he was arrested for Driving Under the Influence."[12]

Later, in its Pa.R.A.P. 1925(b) opinion, the court explained why it had changed its mind:

> [I]t later became clear by the Department's next case at *Hambright v. PennDOT*, CP-21-CIVIL-2020-02923 (Com. Pl. 2020),[13] that it was seeking the suspension for the refusal on the theory that the officer had reasonable grounds to believe that [Bold] was in control of the movement of the truck rather than its operation. After [PennDOT] clarified that it had used movement as the basis for the refusal in the present case as well as in the *Hambright* case we simply changed our ruling to sustain the appeal and ordered that the transcript of *Hambright* be used to supplement the record of the case at bar.[14]

The court asserted "that the facts clearly show that [Bold] was in control of the 'operation' of the vehicle," noted its puzzlement that PennDOT had refused to invoke that theory and "refused to alter [its] position," and explained that "all of the cases advanced by [PennDOT] were based upon facts where it could be reasonably concluded that the licensee *had been* in control of the vehicle's operation rather than the movement."[15] But the court found that *Solomon* controlled in Bold's favor with respect to the actual-control-of-the-movement theory to which PennDOT insisted upon hitching its case.[16] The court

---

[12] Order of Court, 7/10/2020 (filed 7/16/2020).

[13] In *Hambright*, the Commonwealth Court later reversed the trial court's ruling sustaining the driver's appeal of his suspension on the same grounds as it did in the instant matter. *See Hambright v. PennDOT*, 264 A.3d 834 (Pa. Cmwlth. 2021) (memorandum).

[14] Tr. Ct. Op., 1/4/2021, at 3. The *Hambright* transcript does not appear in the record certified to this Court.

[15] *Id*. at 4 n.6 (original emphasis).

[16] *See* 966 A.2d 640 (finding insufficient grounds for suspicion that a suspect exercised control of the movement of his vehicle where suspect was sleeping in the (continued…)

concluded that "[t]here was no evidence upon which the officer could have reasonably inferred that the vehicle had been driven while [Bold] was under the influence."[17]

PennDOT appealed, and a bare majority of the Commonwealth Court, sitting *en banc*, reversed.[18]  In advance of argument, the court directed the parties to address the following issues:[19]

> 1.     Whether driving under the influence requires the actual operation of a vehicle[?]
>
> 2.     Whether the trial court erred in relying on *Solomon* . . . and whether the trial court can be reversed without overruling *Solomon*[?]
>
> 3.     Whether the [c]ourt can or should follow *Hambright*[, *supra*?]
>
> 4.     Whether the determination of control over the movement of a vehicle is a factual or legal question[?][20]

After reviewing its own case law, the Commonwealth Court candidly admitted that its precedent had

> often conflated the term "operates" with the phrase "is in actual physical control of the movement of a vehicle," as used in Section 1547(a) of the Vehicle Code.  This conflation has engendered confusion in license

reclined driver's seat of his parked vehicle, within walking distance of a bar, at 3 a.m. on a January morning with his engine running).

[17]     T.C.O. at 5 (citing *Solomon*, *supra*; *Commonwealth v. Woodruff*, 668 A.2d 1158 (Pa. Super. 1995)).

[18]     *Bold v. PennDOT*, 285 A.3d 970 (Pa. Cmwlth. 2022) (*en banc*).  Judge Wojcik wrote the majority opinion, joined by President Judge Cohn Jubelirer, and Judges Covey and Ceisler.  Senior Judge Leavitt wrote a dissenting opinion, joined by Judges McCullough and Fizzano Cannon.

[19]     PennDOT presented only one issue in its initial brief to the Commonwealth Court, inquiring whether "the trial court err[ed] as a matter of law in holding that Officer Gelnett did not have reasonable grounds to believe that Bold was operating or was in actual physical control of the movement of a vehicle while he was under the influence?" PennDOT's Cmwlth. Ct. Br. at 4.

[20]     Cmwlth. Ct. Order, 12/7/2021 (*per curiam*).

suspension implied consent cases concerning the issue presented herein, *i.e.*, whether an arresting officer has reasonable grounds to believe that a licensee was in actual physical control of the movement of a vehicle, where the arresting officer testifies, and the facts indicate, that the licensee had not been driving. In an effort to eliminate this confusion, we hold that because Officer Gelnett had reasonable grounds to believe that [Bold] was in actual physical control of his vehicle while intoxicated, despite the fact that [Bold] was not driving, Officer Gelnett properly requested that [Bold] undergo chemical testing.[21]

But the Commonwealth Court's ruling did little to dispel the confusion.

Rather than engage the implied consent law in light of our interpretive canons,[22] the court primarily compared the instant case to a legacy of its own precedents spanning changes in Section 1547 and the law of DUI.[23] In particular, the court looked to *Gammer v. PennDOT*,[24] in which it had held that, "[g]enerally, the motorist's presence in the driver's seat of the vehicle with the engine on has been deemed sufficient to satisfy the reasonable grounds test."[25]

---

[21] *Bold*, 285 A.3d at 979.

[22] *See generally* Statutory Construction Act, Act of Dec. 6, 1972, Pub. L. 1339, No. 290.

[23] We indicated in *Banner*, 737 A.2d 1203, that the identical drive/operate/actual physical control terminology should carry one stable meaning between Sections 1547 and 3802. *See id*. at 1207 n.4 ("Although [*Commonwealth v. Wolen*, 685 A.2d 1384 (Pa. 1996)] involved a criminal prosecution for driving under the influence, we find that the definition of 'actual physical control' employed therein reflects the same factors considered in cases involving license suspensions."). This conclusion is consistent with the interpretive principle that "[s]tatutes *in pari materia*"—*i.e.*, statutes that "relate to the same persons or things or to the same class of persons or things"—"shall be construed together, if possible, as one statute." 1 Pa.C.S. § 1932.

[24] 995 A.2d 380 (Pa. Cmwlth. 2010).

[25] *Id*. at 384 (citing *Riley v. PennDOT*, 946 A.2d 1115 (Pa. Cmwlth. 2008); *Vinansky v. PennDOT*, 665 A.2d 860 (Pa. Cmwlth. 1995); *Paige*, 628 A.2d 917; *Polinsky v. PennDOT*, 569 A.2d 425 (Pa. Cmwlth. 1990)). The majority found *Gammer* analogous on its facts. In that case, the police officer found the suspect seated in the driver's seat of a running vehicle in a remote part of a motel parking lot. Although seated in the driver's (continued…)

Ultimately, the Commonwealth Court found its 1995 decision in *Vinansky v. PennDOT* most on-point. In that case, a police officer spotted the suspect in a pickup truck parked behind a volunteer fire department, near the department's social club. The engine was running and the brake lights were on. The suspect was seated inside with his head slumped over the steering wheel. He refused to submit to chemical testing and his license later was suspended. He appealed. In determining that the officer had reasonable grounds to seek blood testing, the Commonwealth Court relied not on the text of the statute, but on its own version of the test, pursuant to which PennDOT was required to show that the officer had reasonable grounds to believe "*that the motorist was operating, or actually controlling or operating the movement of a motor vehicle*" while under the influence.[26] But the court immediately, if inadvertently, confused the already confusing test by stating that, under Section 1547, "a police officer needs to show only that he or she had reasonable grounds to believe that a motorist was *driving* under the influence of alcohol."[27] Still worse, it then added that the officer need *not* "believe [that] the motorist was actually *driving* under the influence of alcohol, only that the vehicle was under his or her control."[28] In short, by turning to *Vinansky* as tantamount to controlling authority, the lower court embraced a decision as confused in its articulation of the test as any case that the court purported to rectify.

The court also rejected Bold's reliance upon *Solomon*. In that case, the suspect was found asleep in the reclined driver's seat of a vehicle located across the street from a Philadelphia night club. The car was running, but it was a cold and snowy night. The

---

seat, the suspect—whom the officer had arrested twice previously for DUI—was slouched over the passenger's seat.

[26]  *Vinansky*, 665 A.2d at 862 (original emphasis).

[27]  *Id*. (emphasis added).

[28]  *Id*. (original emphasis).

*Solomon* court took note of this Court's observation in *Banner* (which post-dated *Vinansky*) that, to find reasonable grounds, "at the very least, there must be some objective evidence that the motorist exercised control over the movement of the vehicle at the time he was intoxicated."[29] Importantly, the *Solomon* court observed that "[t]here was no objective evidence presented to indicate Solomon had driven the vehicle at any point prior to the arrival of the police."[30] Not only did the lower court reject the comparison to *Solomon* in favor of the analogy to *Vinansky*, it further determined that, "to the extent that *Solomon* compels a different result herein, it is expressly overruled."[31]

The muddle of case law acknowledged by the Commonwealth Court in this case and expanded upon by the parties' briefing and our own research only underscores the importance of allowing *statutes*, not layers of case law, to determine outcomes in matters of statutory interpretation. Here, we confront a seemingly straightforward question of law: whether the undisputed facts in this case satisfy the applicable Section 1547 requirement that the officer requested chemical testing upon reasonable suspicion that Bold had been "operating or in actual physical control of the movement" of his vehicle.[32] Section 1547 must provide the answer.

"[O]ur standard of review in a license suspension case is to determine whether the factual findings of the trial court are supported by competent evidence and whether the trial court committed an error of law or an abuse of discretion."[33] Here, there is no factual

---

[29] *Banner*, 737 A.2d at 1207; *see Solomon*, 966 A.2d at 642.

[30] *Solomon*, 966 A.2d at 642.

[31] *Bold*, 285 A.3d 978-79.

[32] No one maintains—and the trial court did not find—that Bold drove the car, so our discussion excludes driving, in order to focus upon the two statutory criteria that PennDOT argues are applicable in this case.

[33] *Banner*, 737 A.2d at 1205.

dispute. The courts below, and the parties, take Officer Gelnett's uncontradicted account at face value. We accept the trial court's endorsement of Officer Gelnett's admission that he did not believe that Bold had been *driving* under the influence.

We interpret statutes *de novo*, without deference to the legal conclusions of the courts below.[34] When interpreting a statute, our objective first and foremost is "to ascertain and effectuate the intention of the General Assembly."[35] When possible, we must interpret a statute "to give effect to all of its provisions."[36] The words of a statute "shall be construed according to . . . their common and approved usage."[37] "When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit."[38]

However, when the language is ambiguous or unclear, we may consider other factors, including (but not limited to): "[t]he occasion and necessity for the statute"; "[t]he mischief to be remedied" and "object to be obtained"; and "[t]he consequences of a

---

[34]    *See Bowling v. Office of Open Records*, 75 A.3d 453, 476 (Pa. 2013); *In re Doe*, 33 A.3d 615, 624 (Pa. 2011). The scope of our review is plenary. *See Gilbert v. Synagro Central, LLC*, 131 A.3d 1, 10 (Pa. 2015). This is particularly relevant here, where PennDOT in the Court of Common Pleas allegedly committed the outcome of Bold's appeal exclusively to the question of Bold's "actual physical control of the movement of" his vehicle to the exclusion of "operation" as a possible basis for Officer Gelnett's request for chemical testing. As Appellee, PennDOT is free to pursue an argument it neglected below, *see Sherwood v. Elgart*, 117 A.2d 899, 901 (Pa. 1955), and the Commonwealth Court understood PennDOT to be pressing both bases for affirmance. Indeed, that court directed the parties to prepare oral argument on both criteria. Moreover, the question as to which we granted review also encompasses both criteria.

[35]    1 Pa.C.S. § 1921(a).

[36]    *Id*.; *see id*. § 1922(2) (directing us to presume "[t]hat the General Assembly intends the entire statute to be effective and certain").

[37]    *Id*. § 1903(a). In discerning common and approved usages in the absence of a statutory definition, we may consult dictionary definitions. *See Commonwealth v. Hart*, 28 A.3d 898, 909 (Pa. 2011).

[38]    *Id*. § 1921(b).

particular interpretation."[39] We interpret a remedial statute like Section 1547 "liberally . . . to effect [its] objects and to promote justice."[40] We may presume that the legislature "does not intend a result that is absurd, impossible of execution or unreasonable."[41] We also may presume that, when this Court "has construed the language used in a statute, the General Assembly in subsequent statutes on the same subject matter intends the same construction to be placed upon such language."[42]

The focus of our inquiry is Section 1547's reference to "hav[ing] been driving, operating or in actual physical control of the movement of a vehicle." If Officer Gelnett had reasonable grounds to believe that any of these conditions were present, then his request for Bold's submission to chemical testing was justified, and Bold's suspension appeal must fail. As noted earlier, Officer Gelnett's own testimony, embraced as true by the trial court, forecloses the prospect that he believed that Bold had been *driving* while intoxicated. Accordingly, the question reduces to whether Bold might have been "operating" or "in actual physical control of the movement" of his vehicle. This inquiry requires us to establish what, precisely, those words mean.[43]

Here, the Commonwealth Court concluded that no past or present movement needs to occur in order to demonstrate actual physical control of the movement of a vehicle. Rather, it is sufficient that a driver *could* easily have driven the car, for example

---

[39]     *Id*. § 1921(c).

[40]     *Id*. § 1928(c); *see O'Rourke v. Commonwealth*, 778 A.2d 1194, 1203 (Pa. 2001) ("[R]emedial statutes are to be liberally construed to effect their objects.").

[41]     1 Pa.C.S. § 1922(1).

[42]     *Id*. § 1922(4).

[43]     "In construing and giving effect to the text, we should not interpret statutory words in isolation, but must read them with reference to the context in which they appear." *A.S. v. Pa. State Police*, 143 A.3d 896, 906 (Pa. 2016) (cleaned up).

by merely removing his foot from the brake pedal or shifting the car into gear. In doing so, the court followed a decades-long line of intermediate court cases involving variations of both the implied consent and DUI statutes applicable at the time.[44] But some cases have held otherwise, requiring a reasonable suspicion of actual movement, including *Commonwealth v. Byers*,[45] arguably (at least) the plurality leading our decision in *Commonwealth v. Wolen*,[46] and our unanimous decision in *Banner*. The use of the word "actual" as well as the definite article in "the movement" at least suggest that the driver actually has to have done something, that there was an actual movement near in time to the police encounter—or at least reasonable grounds to suspect such actual movement.[47] Granting due respect to the capable Pennsylvania jurists who have examined this

---

[44]   *See*, *e.g., Vinansky*, 665 A.2d 860; *PennDOT v. Farner*, 494 A.2d 513 (Pa. Cmwlth. 1985); *Commonwealth v. Kallus*, 243 A.2d 483, 485 (Pa. Super. 1968) ("[I]t is not necessary that the vehicle itself must be in motion but . . . it is sufficient if the operator is in actual physical control of the movements of either the machinery of the motor vehicle or of the management of the movement of the vehicle itself.").

[45]   650 A.2d 468 (Pa. Super. 1994), *criticized by Commonwealth v. Wolen*, 685 A.2d 1384, 1386 n.4 (Pa. 1996) (Opinion Announcing the Judgment of the Court (hereinafter, "OAJC")); *see Bold*, 285 A.3d at 981-82 (Leavitt, J., dissenting) (citing *Byers*, 650 A.2d at 469) (emphasis added).

[46]   While the *Wolen* plurality criticized *Byers* for endorsing a "threat to public safety" test for DUI, it nonetheless adopted *Byers*' circumstantial test as stated. *See Wolen*, 685 A.2d at 1385 (OAJC) ("[W]hether a person is in actual physical control of a motor vehicle is determined based on the totality of the circumstances, including the location of the vehicle, whether the engine was running and whether there was other evidence indicating that the defendant had driven the vehicle at some point prior to the arrival of police on the scene.").

[47]   *See Gammer*, 995 A.2d 380; *Solomon*, 966 A.2d 640; *Woodruff*, 668 A.2d at 1161 (finding "actual physical control" of the movement of the vehicle due to "the motor running, the location of the vehicle, and additional evidence showing that the defendant had driven the vehicle," and noting that "the suspect location of [the] vehicle" supported the inference that it was driven, which *Byers* indicated is "a key factor in the finding of actual control").

terminology in the past and reached divergent conclusions, we think it clear that both accounts of the statute are reasonable.[48]

All of the above cases and considerations aside, we cannot avoid the statute's present language. We labor in vain to understand how "operate," according to its common and approved usage, does not encompass and subsume both driving *and* actual physical control of the movement of a vehicle. For example, one dictionary defines "operate" as "to effect or produce by action or the exertion of force or influence," and "[t]o cause or actuate the working of."[49] A prominent legal dictionary defines "actual physical control" as "[d]irect bodily power over something, esp. a vehicle,"[50] but notably does not include the reference to "movement" that Section 1547 does. Meanwhile, the same dictionary defines driving while intoxicated as "[t]he offense of *operating* a motor vehicle in a physically or mentally impaired condition after consuming" drugs or a threshold volume

---

[48]    In dissent below, Senior Judge Leavitt made a game effort to give discrete effect to all three of Section 1547's triggering provisions, proceeding from the common understanding that, under the Vehicle Code, a "vehicle" encompasses not only cars and trucks but also a motorcycle, a bicycle, or even a Segway. *Bold*, 285 A.3d at 985 (Leavitt, S.J., dissenting) (citing 75 Pa.C.S. § 102 (defining a vehicle as "[e]very device in, upon or by which any person or property is or may be transported or drawn upon a highway")). One *drives* a car or truck but rides a motorcycle or bicycle, *but see* 75 Pa.C.S. § 102 (defining "driver" as "[a] person who drives or is in actual physical control of a vehicle," which suggests no vehicle-specific limitation). The dissent suggested that "operates" was incorporated into the statute to ensure comprehensive application of the implied consent law to the other above-mentioned vehicles and any others. *Id*. at 985. Among the difficulties with this interpretation is that the three-pronged standard for implied consent was enacted by amendment in 1982, *see PennDOT v. Farner*, 494 A.2d 513, 515 (Pa. Super. 1985), while the "motor" in "motor vehicle" was not removed from Section 1547 until 2003. *See* Act of Sept. 30, 2003, Pub. L. 120, No. 24, §§ 9.1, 10. Thus, it is implausible that the legislature added "operating" in 1982 with the intention to encompass bicycles and other non-motorized vehicles, which evidently were excluded from Section 1547 until 2003.

[49]    *Operate*, Oxford English Dictionary (2d ed.) ("OED").

[50]    *Actual Physical Control*, Black's Law Dictionary (10th ed.).

of alcohol, without any reference to driving as such or to controlling movement.[51] "Operate" plainly encompasses "driving," and arguably subsumes "actual physical control of the movement of a vehicle" as well. Once a car moves under a person's control, it clearly has been operated.

The Vehicle Code's other uses of "operate" and its variants are not to the contrary.[52] An "autocycle," for example, is "[a] three-wheeled motorcycle that has a steering wheel and seating that does not require the *operator* to straddle or sit astride." An "automated red light enforcement system" is a sensor that "automatically produces one or more recorded images of a vehicle at the time the vehicle is used or *operated* in a manner which is a violation under this title." A "certified driving instructor" is someone certified "to teach the safe *operation* of motor vehicles." An "electric vehicle" is one "which *operates* solely by use of a battery or battery pack." An "ignition interlock limited license" is one issued to a driver "whose *operating* privilege is suspended or revoked" under Section 1547 or 3802, and it "require[es] the individual to *operate* only motor vehicles equipped with a functioning ignition interlock system." The *operating* privilege is "[t]he privilege to apply for and obtain a license to use as well as the privilege to use a vehicle on a highway." A "learner's permit" is one "issued for the purpose of learning to *operate* a motor vehicle." "Registration" confers "[t]he authority for a vehicle to *operate* on a highway." Not one of the above definitions refers to driving or actually physically controlling the movement of a vehicle—because, assuming common parlance, they don't have to.

---

[51]  *See Driving While Intoxicated*, BLACK'S LAW DICTIONARY (10th ed.) (emphasis added).

[52]  All quotations in this paragraph are found in the Vehicle Code's definitional section, 75 Pa.C.S. § 102. All emphasis is ours.

The statutory and common definitions of driver, too, resist any effort to give each of the three provisions discrete effect. The Vehicle Code itself underscores the problem by defining "driver" as "[a] person who *drives* or is in *actual physical control* of a vehicle."[53] This creates another redundancy within Section 1547 by encompassing the putatively separate criterion of actual physical control within the act of driving.

Notably, the title of Section 3802 refers only to "[*d*]*riving* under influence of alcohol or controlled substance," even as its body adds operation and actual physical control of the movement to the mix. Here again, the suggestion is (a) that *driving* as such is the focus and (b) that driving encompasses actual physical control of the movement of a vehicle. In interpreting an ambiguous statute, we may seek non-binding guidance in a statute's title.[54]

In sum, this all-consuming use of "operate" confounds our efforts to avoid interpreting this statute in a way that renders any language gratuitous or "mere surplusage,"[55] and the word "drive" arguably does the same. This explains Pennsylvania courts' difficulties in avoiding conflation of the very terms in question, including this Court

---

[53] 75 Pa.C.S. § 102. Lay dictionaries are not to the contrary. The OED defines drive as "to carry or convey in a vehicle" and "to guide a vehicle," and defines "driver" as "one who drives." As noted above, we find the use of "actual" as a modifier of "control" and the definite article ahead of "movement" to suggest that the officer must suspect *actual* movement, rather than the mere *potential* for movement. Dictionary definitions of movement provide some support for this reading. *See Movement*, AMER. HER. COLL. DIC. (3d ed. 1993) ("1.a. The act or an instance of moving; a change in place or position. b. A particular manner of moving."); *Movement*, OED ("the action or process of moving . . .; change of position"); *see also Actual*, OED ("of or pertaining to acts; exhibited in deeds; practical, active").

[54] *See* 1 Pa.C.S. § 1924 ("The headings prefixed to titles, parts, articles, chapters, sections and other divisions of a statute shall not be considered to control but may be used to aid in the construction thereof.").

[55] *Commonwealth v. McClelland*, 233 A.3d 717, 734 (Pa. 2020) ("Some meaning must be ascribed to every word in a statute . . ., and there is a presumption that disfavors interpreting language as mere surplusage.").

in *Banner*, a case that repeatedly used the various terms interchangeably and/or suggested one's inclusion within another.[56]  This is less mere sloppiness than it is a reflection of the inescapable overlap of the terminology.  "Operate" has a plain meaning that all but necessarily enfolds the other two terms.  And, by statutory definition, "driver" encompasses one who is in "actual physical control of the movement of a vehicle."  This is not strictly incompatible with a definition of actual physical control broad enough to capture the mere potentiality of movement, but it creates textual surplusage on any plausible account.

Nor are the above structural and lexical concerns the only problem.  For precisely the same reason, applying a plain language approach just to the word "operates" in conformity with the above raises the prospect of an absurd result.  If *any* actuation of a car constitutes operating that vehicle, then any movement of its machinery, simple or complex, qualifies—from opening the door to rolling down the window, turning on the

---

[56]    *See Banner*, 737 A.2d at 1206 (all emphasis added) ("[T]o sustain a suspension of operating privileges under section 1547, [Penn]DOT must establish that the licensee: (1) was arrested for driving under the influence by a police officer who had reasonable grounds to believe that the licensee was *operating or was in actual physical control of the movement of the vehicle* while under [the] influence of alcohol"); *id.* at 1207 ("Reasonable grounds exist when a person in the position of the police officer, viewing the facts and circumstances as they appeared at the time, could have concluded that the motorist was *operating* the vehicle while under the influence of intoxicating liquor."); *id.* ("In determining whether an officer had reasonable grounds to believe that a motorist was in '*actual physical control*' of a vehicle, the court must consider the totality of the circumstances, including the location of the vehicle, whether the engine was running and whether there was other evidence indicating that the motorist *had driven* the vehicle at some point prior to the arrival of the police."); *id.* ("[A]t the very least, there must be some objective evidence that the motorist exercised control over the movement of the vehicle at the time he was intoxicated."); *id.* at 1208 ("A line must be drawn to distinguish circumstances where a motorist is *driving* his vehicle while under the influence of alcohol, which the statute is intended to prevent, and circumstances where a motorist is physically present in a motor vehicle after becoming intoxicated.").

radio, or even opening the glove compartment.[57]  Nothing could be more absurd than subjecting a driver to chemical testing—and, for that matter, conviction of DUI—simply for lowering a window in the heat of summer.

And that's just conventional motor vehicles—daily drivers.  What of a cyclist who, upon drinking to excess, elects to walk rather than ride his bicycle home?  The wheels turn, the free wheel ratchets, the handlebars turn this way and that, perhaps the cyclist actuates the brake to steady the bike—is that not operation of the bike's machinery?  Even in the instant scenario we encounter a measure of absurdity.  As observed in *Byers*, if we interpret Section 1547, and by extension Section 3802, in a way that necessarily proscribes "sleeping it off" on a cold January night in a car running to keep the interior warm, we encourage hypothermia—or the sort of bad decision-making those sections exist to deter.

> The Commonwealth is trying to encourage intoxicated people to "sleep it off" before attempting to drive, yet it wants us to punish Byers for doing just that.  The case is only one example of the illogical and inconsistent results we would see if this Court were to adopt a *per se* rule that found a defendant guilty of drunk driving for merely starting his car.  Under such a mechanical application, if Byers had left the bar to call a cab using a cellular phone in his car, and needed to start the car to power the phone, the Commonwealth could charge him with drunk driving.  This result would punish an individual for attempting to comply with the law.[58]

Extend this inference to vehicles that are *designed* for sleep and the risk of absurdity is even more obvious.  From long-haul truckers at truck stops to users of recreational vehicles returning from a raucous campfire, it is foreseeable that would-be drivers who

---

[57]     *See*, *e.g.*, *Farner*, 494 A.2d at 516 (holding that "actual physical control" "involv[es] control of the movements of either the machinery of the motor vehicle *or* of the management of the movement of the vehicle itself, without a requirement that the entire vehicle be in motion" (emphasis added)).

[58]     *Byers*, 650 A.2d at 471.

crawl into bed on a chilly night to fully sleep off their intoxication will idle their vehicles to power the air conditioning, the heat, or other amenities. None of these individuals is more than a handful of movements away from putting the vehicle in gear, but we do not punish individuals for the crimes they *might* commit.

All of these considerations are embedded in this Court's ruling in *Banner*, and we conclude that *Banner* is most instructive for today's case. In *Banner*, police found the appellant sleeping in the reclined passenger seat of his car, which was parked along a roadway. The keys were in the ignition, but the engine was not running and the lights were not on. The appellant failed a field test and was arrested for DUI. He refused chemical testing, and his license was revoked under Section 1547. The appellant appealed the suspension and the Court of Common Pleas dismissed the appeal, finding "that the officer had reasonable grounds to believe that the [a]ppellant had been in control of his vehicle while under the influence of alcohol."[59] The Commonwealth Court affirmed.

The *Banner* Court unanimously held:

> Reasonable grounds exist when a person in the position of the police officer, viewing the facts and circumstances as they appeared at the time, could have concluded that the motorist was operating the vehicle while under the influence of intoxicating liquor. In determining whether an officer had reasonable grounds to believe that a motorist was in "actual physical control" of a vehicle, the court must consider the totality of the circumstances, including the location of the vehicle, whether the engine was running and *whether there was other evidence indicating that the motorist had driven the vehicle at some point prior to the arrival of the police*.[60]

With this standard in mind, the *Banner* Court distinguished *Vinansky* ("actual physical control was found where the licensee was discovered slumped over the steering wheel of a truck parked in a parking lot behind a fire department social hall[;] the vehicle's

---

[59]     *Banner*, 737 A.2d at 1205.

[60]     *Id*. (citation omitted; emphasis added).

engine was running and its brake lights were on"); *Paige* ("actual physical control was found where the licensee was asleep, slumped over the steering wheel with the key in the ignition[;] the vehicle was parked on a city street with its parking lights on"); *Polinsky* (actual physical control "when [the driver] was found asleep behind the wheel of her vehicle, parked adjacent to a fast food restaurant pick-up window[;] the headlights . . . were on and the standard transmission was in gear, although the engine was not running"); and *Farner* (actual physical control when "the licensee was found behind the wheel of his truck, parked in a traffic lane with his hands on the steering wheels[;] the licensee had started the engine and activated the brake lights, but had left the transmission in 'park' and did not cause the vehicle to move").[61] Banner, conversely, was not behind the wheel, the lights and engine were off, and "[t]he only evidence tending to establish [his] control over the vehicle's movement [was] the location of the car parked safely alongside a rural road near a convenience store," facts we found "too tenuous . . . to afford the officer reasonable grounds to have believed that [the appellant] was in *actual physical control* of the movement of the vehicle while intoxicated."[62] That the keys were in the ignition did not change our analysis, even though on the broadest account it would have required little effort for Banner to have started the car.

"A line must be drawn," the Court concluded, "to distinguish circumstances where a motorist is driving his vehicle while under the influence of alcohol, which the statute is intended to prevent, and circumstances where a motorist is physically present in a motor vehicle after becoming intoxicated."[63] And in case this apparent requirement that the

---

[61]    These parentheticals rely upon quotations of *Banner*'s descriptions of these cases. *See* 737 A.2d at 1207-08.

[62]    *Id*. at 1208 (emphasis in original).

[63]    *Id*. (emphasis added).

officer have reasonable suspicion that the act of driving (commonly understood) had taken place before chemical testing could be sought, the Court explicitly rejected PennDOT's case-specific, fact-based claim that the appellant could only have reached the place the car was found if he or she had driven it.

> Such a conclusion requires the officer, without ever observing the car in motion or *any other indication that [the appellant] had recently driven the car*, to assume that [the appellant] operated the vehicle, that he was intoxicated at that time and that no one else drove the vehicle or [the appellant] to the road near the convenience store where the car was parked.[64]

These passages can best be read together with the understanding that control of the movement requires some suspicion of driving, commonly understood.

Notwithstanding any contrary suggestion by the majority below, we detect very little inconsistency with Pennsylvania courts' post-1982 decisional law, and less still since our decision in *Banner*. No matter how diligently we endeavor to formalize the inquiry at hand, there is an inescapable fact-sensitivity to these cases. While some cases certainly have indicated that no suspicion of past or present movement of an entire vehicle is necessary to justify chemical testing (or, by extension, to sustain a conviction for DUI), in the vast majority of those cases the facts have not depended on that proposition. Time and again, those cases have involved cars in gear, feet on pedals, drivers slumped over the wheel, cars located partially or wholly in the driving lanes of active roadways—all circumstances strongly suggestive of a vehicle that recently has moved. Many cases decided before *Banner* underscored the difference between driving a car and mere presence in it.[65] Requiring suspicion of prior actual motion before chemical testing may

---

[64]   *Id*. at 1208 n.6 (emphasis added).

[65]   *See Woodruff*, 668 A.2d 1158 (car partially protruding into traffic lanes); *Commonwealth v. Trial*, 652 A.2d 338 (Pa. Super. 1994) (car stopped diagonally across (continued…)

be demanded would change the result in very few of these cases, and would likely change very few outcomes moving forward. It would merely clarify that the statute must be interpreted in service of its clear intention to deter, detect, and punish intoxicated *driving*.

The legislature has signaled no apparent concern with *Banner*'s account. We decided *Banner* nearly twenty-five years ago, and the General Assembly has amended the Vehicle Code numerous times in the years since, including both sections 1547 and 3802.[66] But during that span, it has never materially changed the relevant language of Section 1547. This suggests assent or acquiescence to *Banner*'s requirement of suspicion of actual motion.[67] Moreover, no case appears ever to have called *Banner* into question, and neither party now suggests it was wrongly decided.

PennDOT relies a great deal on the Superior Court's brief *en banc* DUI decision in *Commonwealth v. James*[68] for the trivial proposition that actual movement need not be demonstrated to establish grounds to believe that a suspect had been driving, operating

---

roadway); *Commonwealth v. Leib*, 588 A.2d 922 (Pa. Super. 1991) (car stopped in middle of road); *Farner*, 494 A.2d 513 (car in traffic lane); *cf. Gammer*, 995 A.2d 380 (decided after *Banner*—driver with known history of DUI parked in running car in remote area of parking lot).

[66] Since this Court decided *Banner* in 1999 in a fashion that suggested suspicion of actual movement of the vehicle was necessary for Section 1547 and, by extension, Section 3802, Section 1547 has been amended at least four times. *See* Act of Sept. 30, 2003, Pub. L. 120, No. 24, § 9.1, 10; Act of May 11, 2006, Pub. L. 164, No. 40, § 2; Act of May 25, 2016, Pub. L. 236, No. 33, § 2; Act of July 20, 2017, Pub. L. 333, No. 30, § 3. Section 3802 has been amended at least twice, including its 2003 renumbering from Section 3731 to its present designation as Section 3802. *See* Act of Sept. 30, 2003, Pub. L. 120, No. 24, § 16; Act of May 11, 2006, Pub. L. 155, No. 36, § 2.

[67] *See* 1 Pa.C.S. § 1922(4) ("In ascertaining the intention of the General Assembly in the enactment of a statute [a court may presume] . . . [t]hat when a court of last resort has construed the language used in a statute, the General Assembly in subsequent statutes on the same subject matter intends the same construction to be placed upon such language.").

[68] 863 A.2d 1179 (Pa. Super. 2004) (*en banc*).

or in actual physical control of the movement of the vehicle. But this is a strange choice. In *James*, the suspect parked a vehicle in a lot but did not pay, whereupon a lot attendant called a towing company to remove the car. Two trucks responded, and one of the drivers strapped the car's wheels to a platform on the rear of the tow truck. The suspect confronted the tow truck operator, interfered with the operator's work, and ultimately got into his car, started it, put it in reverse, and managed to lurch the car partway off the platform, damaging the tow truck in the process. James was arrested for DUI. At his preliminary hearing, James filed a motion for a writ of *habeas corpus*, which the court granted.

The *James* court reversed, and rightly so. But its reasoning was conclusory. It paid no regard to the thrust of our decisions in *Wolen* and *Banner*. The court instead cursorily reviewed the evolution of the DUI statute up to the 1982 amendment. It cited four of its pre-*Banner* decisions as well as Pennsylvania's Suggested Standard Jury Instruction regarding driving, operating, and actual physical control of the movement of the vehicle—an instruction that is not found in the current manual—in support of the proposition that "'operate' does not require evidence that the vehicle was in motion. It merely requires evidence of actual physical control of either the machinery of the motor vehicle or the management of the vehicle's movement."[69] After making a show of its belief that no movement, present or past is required to substantiate a DUI charge, the

---

[69]    *Id*. at 1183 n.4 (citing *Commonwealth v. Johnson*, 833 A.2d 260, 263 (Pa. Super. 2003); *Commonwealth v. Wilson*, 660 A.2d 105, 107 (Pa. Super. 1995); *Commonwealth v. Grimes*, 648 A.2d 538, 544 (Pa. Super. 1994); *Commonwealth v. Crum*, 623 A.2d 799, 801 (Pa. Super. 1987)). In further support of our conclusion that the statute is unclear, the standard jury instruction, as quoted by the court in *James*, itself deemed operation and actual physical control of the movement to overlap substantially or even entirely. *James*, 863 A.2d at 1183 (quoting PA. SSJI (CRIM.) 17.3731C) ("A person operates or is in actual physical control of a vehicle if he or she is in physical control of either the machinery of the vehicle or the management of the vehicle's movement." (*James* court's emphasis omitted)).

court found that the evidence presented at the preliminary hearing sufficed to form a *prima facie* case that James *actually* moved the car. Once again, a ruling that might be read not to require actual movement nonetheless arose from facts providing reasonable grounds to suspect that movement actually occurred.

A similar difficulty arises with PennDOT's second line of argument. PennDOT calls attention to the fact that, in *Balentine v. Chester Water Auth.*, this Court adopted a broad definition of what it means to "operate" a vehicle—one that unequivocally would subsume both "driving" and "actually controlling the movement" of a vehicle.[70] In that case, interpreting the exception to government tort immunity provided in 42 Pa.C.S. § 8542(b)(1), we found "operation" where the driver of a water authority van parked it in a roadway where it later was struck and pushed into plaintiff's decedent. But as with other cases with some superficial benefit to PennDOT's position, a closer reading of the text tends to support our present analysis. In *Balentine*, we suggested that operation included where and how a government agent parked a vehicle specifically because "we can assume, absent evidence to the contrary, that a government agent operated the vehicle to arrive at that position"—*i.e.*, that it was *moved* to that location.[71] When an intoxicated person leaves a bar, starts his or her car to turn on the heat, and goes to sleep neither having moved the car nor having any intention to move the car, there is no relevant continuum of movement to speak of. Here, we cannot say that Bold "operated the vehicle

---

[70]    191 A.3d 799 (Pa. 2018).

[71]    *Balentine*, 191 A.3d at 809; *cf. id.* at 810 (noting a "continuum of activity, which entails a series of decisions and actions, taken together, which transport the individual from one place to another" (cleaned up)).

to arrive" where it was found in any relevant sense because Officer Gelnett declined to say that much.[72, 73]

---

[72] PennDOT also suggests that the evolution over time of the implied consent and DUI statutes favors its position in this case. But that history is messy and not entirely illuminating; if anything, it provides additional support to our all-encompassing reading of "operates." As of 1977, the implied consent law (codified at 42 Pa.C.S. § 1547, as it always has been) provided that "[a]ny person who *operates* a motor vehicle in this Commonwealth" impliedly consents to a chemical test. But an officer could seek testing only if he or she had "reasonable grounds to believe the person to have been *driving* a motor vehicle while under the influence of alcohol" (emphasis added). The DUI offense from 1959 to 1977 was found in 75 Pa.C.S. § 1037, and it provided that "[i]t shall be unlawful for any person to *operate* a motor vehicle, tractor, streetcar or trackless trolley omnibus, while under the influence of intoxicating liquor or any narcotic drug or habit producing drug" (emphasis added). Regarding the 1976 amendment, the Superior Court concluded that "the General Assembly had . . . decided that the word 'drive' required evidence that the vehicle had to be actually in motion for the offense to be committed." *Farner*, 494 A.2d at 515 (citing *Commonwealth v. Brown*, 407 A.2d 1318, 1319-20 (Pa. Super. 1979)). But as noted, after the 1976 amendments, the implied consent provision "used both of the verbs discussed above; the one who 'operates' a vehicle is deemed to have given consent 'if a police officer shall have reasonable grounds to believe' him to have been 'driving' the vehicle while under the influence." *Id*.

In 1982, Section 1547 was substantially revised—in relevant part as follows:

> Any person who **drives,** operates **or is in actual physical control of the movement of** a motor vehicle shall be deemed to have given consent to . . . **one or more chemical tests** . . . if a police offer **[shall have]** *has* reasonable grounds to believe the person to have been driving**, operating or in actual physical control of the movement of** a motor vehicle . . . **while under the influence of alcohol or a controlled substance or both** . . . .

Act of Dec. 15, 1982, Pub. L. 1268, No. 289 (deletions in brackets; insertions in bold, italicized typeface). And DUI (general impairment) was redefined to match the above— from proscribing 'driv[ing]" any vehicle to proscribing "driv[ing], operat[ing], or [being] in actual physical control of the movement of" a vehicle while under the influence of alcohol or controlled substances. *Id*. Since then, the language has remained materially the same with respect to both implied consent and DUI.

PennDOT would have us read the 1982 additions as intended to restore the broad, pre-1977 understanding of operate to apply more broadly than to the act of driving or other actual movements of the vehicle. The difficulty, though, is that this neither solves (continued…)

The pattern of outcomes measured against the case-specific facts is clear, and it is in keeping with the *Banner* test, which hasn't been explicitly questioned since its articulation or in this case, either below or in the parties' arguments. It is good law, and in multiple revisitations of the Vehicle Code's implied consent and DUI statutes, the legislature has never seen fit to amend the relevant statutory language.

The Vehicle Code's provisions pertaining to DUI aim to deter one hazardous behavior that imperils public safety and one only: *driving* under the influence.[74] In this

---

the surplusage problem nor alleviates the prospect of an absurd result patently at odds with apparent intent of the legislature in proscribing drunk driving as such.

[73] Not unlike PennDOT, Justice Dougherty in his insightful Concurring Opinion turns to history. He underscores the necessity of giving discrete meaning to each of Section 1547's three operative terms, in particular by noting that, over time, the terms of the statute have increased in number suggesting that the legislature intended to make Section 1547 more encompassing. *See* Conc. Op. at 2-3. Certainly the Concurrence makes the best possible case for its proposed meanings. And we have no quarrel with the Concurrence's desire to find discrete meanings, because doing so is among the bedrock presumptions we apply in interpreting our legislature's chosen words. *See* 1 Pa.C.S. § 1921(a). But even the provision where that presumption is found recognizes that it will not always be "possible" to do so. *Id*. ("Every statute shall be construed, *if possible*, to give effect to all its provisions." (emphasis added)). In our view, this is a rare case where any effort to find discrete meanings for patently overlapping terms will be quixotic at best. Indeed, the Concurrence acknowledges just how difficult the task is. *See* Conc. Op. at 3 ("Like the majority, I am somewhat "confound[ed]" by the similarities between the common parlance of the terms and their conflation throughout the Vehicle Code." (quoting Maj. Op. at 14)). The Dissent's similar effort is unavailing, as evidenced by its citation of a definition of "drive" that incorporates both "operat[ion]" and "control" in a passage denying that there is an inescapable overlap in the relevant terms. *See* Diss. Op. at 4. If there isn't such overlap, it should be far easier than it seems to be to define one term without resort to the other. In any event, the Concurrence aptly observes that "ascribing separate meaning to each of these terms may present a distinction without a difference in the resolution of most cases." *Id*. at 9. We question whether there are *any* cases where the distinction might make a difference. And the very salience of that question implicitly suggests that the terms cannot be disentangled without engaging in lexical gymnastics that our canons of construction neither require nor recommend.

[74] *See Banner*, 737 A.2d at 1208 (noting that the statute aims to prevent "circumstances where a motorist is driving his vehicle while under the influence of alcohol"); *Wolen*, 685 A.2d at 1386 n.4 (OAJC) ("The legislature has reasonably (continued…)

case, the Commonwealth Court departed—as it has before—from this common-sense understanding of the statute, holding that the implied consent statute (and by extension the DUI statute itself) applies even in the absence of anything resembling actual driving. In doing so it violated the spirit, if not the letter, of *Banner*, and it did so based upon an untenable and counterproductive reading of Section 1547.

As in *Banner*, we again hold:

> In determining whether an officer had reasonable grounds to believe that a motorist was in actual physical control of a vehicle, the court must consider the totality of the circumstances, including the location of the vehicle, whether the engine was running and whether there was other evidence indicating that the motorist had driven the vehicle at some point prior to the arrival of the police.[75]

This test must be applied in a fashion that honors the line we cited "distinguish[ing] circumstances where a motorist is driving his vehicle while under the influence of alcohol, which the statute is intended to prevent, and circumstances where a motorist is physically present in a motor vehicle after becoming intoxicated."[76]

Applying this principle to the present case, the outcome is clear. The officer in question candidly admitted he had no reason to suspect that Bold had driven his vehicle while intoxicated, and he believed Bold's account that he intended to sleep off his intoxication in a running car warmed against the January chill. This falls on the blameless side of the line we recognized in *Banner*. The outcome must follow.

The Commonwealth Court's order is reversed.

---

determined that one driving a motor vehicle on the public streets and highways of the Commonwealth while under the influence of alcohol or controlled substances constitutes a threat to public safety *per se* . . . .").

[75] *Banner*, 737 A.2d at 1207 (internal quotation marks omitted); *see Wolen*, 685 A.2d at 1385-86 (OAJC); *Byers*, 650 A.2d at 469.

[76] *Banner*, 737 A.2d at 1208.

Chief Justice Todd and Justices Donohue and Brobson join the opinion.

Justice Dougherty files a concurring opinion.

Justice Mundy files a dissenting opinion.